**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SUSAN SRAIL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07 C 2617** |
| | ) | |
| **VILLAGE OF LISLE,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| **Third Party Plaintiff.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Susan Srail, Jeffrey Srail, Janeen Brzeczek, and Ronald Brzeczek have sued the Village

of Lisle ("Lisle"), individually and as parents and next friends of their minor children Ryan Srail,

Derek Srail, and Hannah Brzeczek. Plaintiffs allege that Lisle violated their rights under the

United States Constitution and Illinois common law in making decisions concerning the water

system that supplies the area where they live and their children attend school.[1] They have moved

to certify two classes of plaintiffs pursuant to Federal Rule of Civil Procedure 23(b)(3). Both

Lisle and former third-party defendant Illinois-American Water Company ("IAWC") oppose

---

[1] Plaintiffs also asserted a claim against Lisle for allegedly authorizing IAWC to
"physically occup[y] and invade[]" the water system, in which plaintiffs claim a property
interest, in violation of the Takings Clause of the Illinois Constitution. *See* Third Am. Compl. ¶
74. However, they voluntarily dismissed this claim with prejudice on March 31, 2008.

class certification.[2]  On February 4, 2008, the Court granted plaintiffs' motion as to one of the proposed classes and certified a second class consisting of residents of the subdivision where plaintiffs live.  The Court deferred consideration of whether to certify a class relating to a separate subdivision until after plaintiffs identified one or more appropriate class representatives from that subdivision.  Since that time, plaintiffs have informed the Court that they have elected not to amend their complaint to add residents from that subdivision as plaintiffs.

Lisle and IAWC each moved the Court to reconsider its order on plaintiffs' motion for class certification.  After reconsidering the arguments of all parties, both in the initial briefs on class certification and in the briefs on the present motion, the Court withdraws its memorandum opinion and order of February 4, 2008 and issues the following opinion.  For the reasons set forth below, the Court denies plaintiffs' motion for class certification as to one of the proposed classes; as to the other proposed class, the Court certifies a class consisting of residents of the subdivision where the named plaintiffs live.  Because plaintiffs have elected not to identify an

---

[2]  Plaintiffs originally sued IAWC as well as Lisle, but the Court dismissed those claims. Lisle then asserted third-party claims against IAWC seeking indemnification and contribution and a counterclaim for interpleader in which it asked the Court to adjudicate who, as between the residents and IAWC, owns the water system.

On March 24, 2008, the Court granted IAWC's motion for summary judgment on Lisle's third-party claims with regard to plaintiffs' claims for violation of equal protection rights and negligence but denied the motion with respect to plaintiffs' claims for taking of property in violation of the Illinois law.  The Court also granted IAWC's motion to dismiss Lisle's counterclaim for interpleader.

After plaintiffs dismissed their Takings Clause claim on March 31, 2008, they effectively eliminated Lisle's remaining third-party claim against IAWC.  On April 7, 2008, the Court dismissed IAWC as a third-party defendant and terminated as moot IAWC's pending motions for reconsideration and to bar testimony.  Because, however, IAWC filed its brief in opposition to class certification jointly with Lisle and Lisle adopted by reference the relevant arguments in IAWC's motion for reconsideration, filed before IAWC was dismissed from the case, the Court will consider IAWC's arguments as well as those made by Lisle.

appropriate class representative from a second, separate subdivision, the Court dismisses without prejudice the claims of the residents of that subdivision. Because the matter was previously disputed, however, the Court will still explain why plaintiffs cannot adequately represent the residents of the second subdivision.

## Background

Plaintiffs have asserted claims relating to the water system serving Oak View, the Lisle subdivision in which the Srails and Brzeczeks live, and Meadows, a subdivision in unincorporated Lisle, as well as Lisle Junior High School and Schiesher Elementary School. Plaintiffs allege that the system does not deliver adequate water pressure to fight fires in either of the subdivisions or in the area of the two schools, endangering plaintiffs, the other residents of Oak View and Meadows, and the children attending the two schools.[3]

Although Lisle has a municipally-owned water system, that system does not serve the residents of Oak View and Meadows or the two schools. Instead, IAWC pays Lisle to "wheel" (*i.e.*, transport) Lake Michigan water that IAWC purchases from the DuPage Water Commission through Lisle's own municipal system to IAWC's intake. IAWC then transmits and supplies that water to Oak View and Meadows and to the schools.

---

[3] In their Third Amended Complaint, plaintiffs also make allegations concerning Lisle's alleged refusal to connect their subdivisions to the municipal sewer system, stating that they are served by a sewer system operated by IAWC. *See* Third Am. Comp. ¶¶ 11-12, 19-20, 25, 27. It is less clear whether they are asserting legal claims premised upon that decision by Lisle or upon any alleged inadequacy of the IAWC-run sewer system. What is clear, however, is that plaintiffs are not pursuing any sewer-related claims as class claims. Plaintiffs repeatedly characterize Lisle and IAWC's argument about the sewer system as a "straw man" argument, *see* Pl. Reply at 1, 11, 16, and state that the case is not about sewer service or sewer problems. *See id.* at 5, 11, 16. As a result, the Court will neither consider nor address the sewer system-related claims contained in plaintiffs' complaint as part of the present motion.

Plaintiffs filed this lawsuit on May 10, 2007. In their third amended complaint, filed on October 10, 2007, plaintiffs contend that Lisle's refusal to supply water to the schools and the subdivisions at adequate firefighting pressure and volume, despite supplying water to other, similarly situated persons and entities within Lisle and its unincorporated areas, deprived plaintiffs, other residents of Oak View and Meadows, and children attending the schools of their rights under the Equal Protection Clause. Plaintiffs make a further claim against Lisle for common law negligence for failing to connect Oak View and Meadows to the municipal water system.

### Discussion

Plaintiffs seek certification of two separate classes. The proposed Schoolchildren Class consists of parents of children who attended the two schools in the school year beginning August 22, 2007. The Residential Class plaintiffs propose consists of individuals who own or reside in residential property in Oak View or Meadows and whose water systems are operated by IAWC.

Lisle and IAWC argue as a preliminary matter that the Court should deny plaintiffs' motion to certify the Schoolchildren Class for lack of standing. They cite *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002), for the proposition that a class cannot be certified if the named plaintiffs or the purported class lacks standing. *Id.* at 680. In that case, however, the Court preceded its standing analysis with an analysis of the question of class certification, "mindful of the Supreme Court's directive to consider issues of class certification prior to issues of standing." *Id.* (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)). The Court will therefore defer until later in this decision consideration of the issue of standing regarding the Schoolchildren Class.

To prevail on a motion for class certification, a plaintiff must satisfy all of the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of one of the subsections of Rule 23(b). Rule 23(a) sets out four threshold requirements for plaintiffs seeking class certification: numerosity (the class must be so large that "joinder of all members is impracticable"); commonality (there must be common questions of law or fact); typicality (the representatives' claims must be "typical" of those of the class); and adequacy of representation (the representatives must fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a)(1)-(4); *see Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).

Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any question affecting only individual members," and that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *see Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997). Having moved to certify the classes, plaintiffs bear "the burden of demonstrating that [class] certification is appropriate." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993).

## 1. Rule 23(a) requirements

### a. Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all its members is impracticable. Fed. R. Civ. P. 23(a)(1). Although courts cannot rely on pure speculation as to the size of the class, plaintiffs need not "specify the exact number of persons in the class." *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989). The proposed Schoolchildren Class consists of the Srails, the Brzeczeks, and all other parents of children attending either or

both of the schools in the school year beginning in fall 2007.  Plaintiffs allege that approximately 900 children attend the two schools.  Plaintiffs further allege that approximately 400 families reside in Oak View and 500 families reside in Meadows.  Lisle does not dispute these figures, nor does it contend that plaintiffs do not satisfy the numerosity requirement for either proposed class.  Plaintiffs have demonstrated that the members of the proposed Schoolchildren Class are sufficiently numerous that their joinder as individual parties would be impracticable.  In addition, the number of families residing in Oak View is sufficiently numerous, even without the Meadows families, that their joinder as plaintiffs would be impracticable.  Thus, a Residential Class consisting of the Oak View residents satisfies the numerosity requirement of rule 23(a)(1).

### b.      Commonality

Rule 23(a)(2) requires the existence of questions of law or fact common to the class.  "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)."  *Keele*, 149 F.3d at 594.  A common set of operative facts is ordinarily present when the defendants are claimed to "have engaged in standardized conduct towards members of the proposed class."  *Id.*

Plaintiffs' claims present questions of both law and fact common to all class members.  Plaintiffs contend that Lisle engaged in a common course of conduct with respect to the entire water system serving Oak View, Meadows, and the schools, and that Lisle's conduct has harmed all members of both proposed classes.  The legal issue of whether Lisle's standardized conduct constitutes an equal protection violation or is actionable under state law is likewise common to all proposed class members.  Lisle does not dispute that plaintiffs can satisfy the commonality requirement for either proposed class.  The Court finds that both the proposed Schoolchildren

Class and a Residential Class consisting of Oak View residents meet the commonality requirement.

### c. Typicality

The typicality requirement of Rule 23(a)(3), which is closely related to the commonality requirement of Rule 23(a)(2), is met if the class representatives' claims are typical of those of the class. The named plaintiffs' claims are typical if they "[arise] from the same event or course of conduct that gives rise to the claims of other class members and [their] claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citations and internal quotation omitted). Factual distinctions between the claims of the named and represented plaintiffs do not defeat typicality. *Retired Chicago Police Ass'n*, 7 F.3d at 597. The claims of the named plaintiffs must, however, have "the same essential characteristics" as the claims of the proposed class. *See id.*

Lisle does not dispute that the Srails and Brzeczeks can satisfy the typicality requirement for the proposed Schoolchildren Class. As parents of children attending the two schools, their claims are identical to those of other parents of schoolchildren, in that they arise from the same course of conduct (Lisle's alleged failure to ensure that the schools have adequate water pressure and volume to fight fires). Furthermore, their claims are based on the same legal theory (deprivation of rights under the Equal Protection Clause). The Court concludes that the named plaintiffs satisfy Rule 23(a)(3)'s typicality requirement for the proposed Schoolchildren Class.

Lisle argues that the named plaintiffs' claims are not typical of those of the Residential Class. The Srails and Brzeczeks live in Oak View, which is within the village limits of Lisle, but over half of the members of the proposed Residential Class reside in Meadows, which is in

unincorporated Lisle. Lisle contends that for this reason, the named plaintiffs' claims do not share the same "essential characteristics" as those of Meadows residents. Lisle/IAWC Resp. at 11.

First, Lisle contends that different legal standards apply to Lisle's decisions not to extend utility service to, respectively, Oak View and Meadows. It argues that although Lisle's actions are reviewed under a "rational basis" test with respect to the claims of Oak View residents, its actions with respect to Meadows residents should be governed by a different standard. Lisle cites *Schroeder v. City of Grayville*, 166 Ill. App. 3d 814, 817, 520 N.E.2d 1032, 1034 (1988), for the proposition that a municipality has no obligation to extend service to an area outside its borders that it has not elected to serve, absent a contractual undertaking to do so, and that it is only prohibited from discriminating unreasonably with respect to rates or services within an area when, Lisle argues, it "has elected to extend utility service to a given unincorporated area." Resp. at 11 n.6. Assuming that *Schroeder* is properly read as Lisle argues, a question the Court need not address at this juncture, it does not undercut a finding of typicality. Plaintiffs' claim is that they were treated differently from other incorporated and unincorporated areas of Lisle, and in this regard their claims have the same essential characteristics of those of the other class members.

Second, Lisle argues that there are significant factual distinctions between the claims of Oak View residents like the Srails and Brzeczeks and those of Meadows residents. For example, Lisle contends that under Illinois statute, before a municipality may provide water service to an area outside its corporate limits, a majority of that area's property owners must petition the municipality for service. Because the Srails and Brzeczeks all live in Oak View, Lisle points out,

8

they faced no such requirement.  And even with a non-residents' petition in hand, Lisle contends, a municipality retains discretion in deciding whether to provide water service outside its corporate limits.  Again, however, given plaintiffs' claims of differential treatment as compared with others similarly situated, this argument does not undermine a finding of typicality.

Lisle also contends that the named representatives' claims are atypical of the claims of Meadows residents because Lisle requires persons living in unincorporated areas to sign pre-annexation agreements (providing that the property will be annexed once the corporate limits of Lisle are contiguous to it) before it will supply services to them.  They argue that certifying the proposed Residential Class would therefore "almost certainly foist annexation upon residents of the Meadows" along with "its attendant cost of municipal taxes and other related charges." Lisle/IAWC Resp. at 12.  Whether Meadows residents wish to be annexed, Lisle contends, is an issue unique to those residents that the named plaintiffs do not face.  The flaw in this argument is that because of the application of Rule 23(b)(3), the only provision under which plaintiffs seek class certification, no Meadows resident would be compelled against his or her will to be a party to a lawsuit as a result of which he or she could be forced to connect to Lisle's municipal water system or be annexed to Lisle.  Because of Rule 23(b)(3)'s notice requirements, every proposed class member will have the ability to opt out of any class that may be certified.  Proper disclosure in the notice that must be sent to class members can and will ensure that all are fully informed of the implications of class membership.  In any event, the record at present reflects that non-residents are not required to sign pre-annexation agreements until they actually choose to connect to the municipal water supply.  *See* Lisle/IAWC Mem. Ex. 25, Dep. of Joseph Broda at 201:20-23.

The claims of the named plaintiffs and the claims of Residential Class members in both Oak View and Meadows involve the same course of conduct–Lisle's alleged failure to connect them to the municipal water supply or otherwise provide them with a water supply adequate to fight fires. In addition, the claims of the named plaintiffs are based on the same underlying legal theories (negligence and violation of the Equal Protection Clause), whether they live in Oak View or Meadows. At present, it does not appear to the Court that matters unique to the claims of the Meadows residents will become a significant focus of the litigation.

That said, the differences between Oak View and Meadows residents do give the Court concern regarding the appropriateness of having the case proceed with a unitary residential class as opposed to two separate classes. The Court will discuss this point further in the following section of this decision, concerning adequacy of representation, a point that sometimes overlaps with the issue of typicality. *See Amchem Prods.*, 521 U.S. at 626 n.20 ("The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'") (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). The Court concludes that the named plaintiffs' claims are typical of those of the Schoolchildren Class and of those of the part of the proposed Residential Class consisting of Oak View residents. The matter is much closer with regard to Meadows residents who are part of the proposed class, a point that the Court need not decide definitively in light of its conclusion in the next section that the named representatives do not adequately represent Meadows residents.

### d. Adequacy of representation

Rule 23(a)(4) requires that the named plaintiffs fairly and adequately represent the class as a whole. *See* Fed. R. Civ. P. 23(a)(4). To evaluate whether plaintiffs have fulfilled this criterion, the Court looks at both "'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chicago Police Ass'n*, 7 F.3d at 598 (citing *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986)). A named plaintiff is generally considered to be adequate so long as his or her claims neither conflict with nor are antagonistic to those of other class members. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Lisle does not dispute plaintiffs' contention that their lawyers are adequate because they have substantial class action experience, have been appointed class counsel in several major cases, and have obtained multi-million dollar recoveries for classes they have represented. The Court has no doubt that plaintiffs' counsel will be able to litigate the case fairly and adequately on behalf of both proposed classes.

Lisle does dispute, however, that the Srails and Brzeczeks are adequate representatives for either class. First, Lisle contends that plaintiffs have not demonstrated that absent class members desire the injunctive relief plaintiffs seek. To the contrary, Lisle contends, many absent class members may not want to be connected to Lisle's municipal water system or receive a new water system. In June 2006, Lisle offered the schools and nineteen Oak View homeowners the opportunity to pay to connect to the Lisle water mains and be removed from IAWC's system. Out of the nineteen homeowners, only one accepted the offer, which Lisle regards as evidence that the rest did not wish to switch water providers. Lisle disputes plaintiffs' contention that

11

when the homeowners were given this option, they were unaware of the alleged inability of

IAWC's water system to fight fires. Rather, Lisle argues, allegations regarding the water

system's firefighting insufficiency were already available to the public by that time. It contends,

for example, that in a public meeting on January 30, 2006, Mrs. Srail and other members of

Lisle's Water Task Force presented findings on "health and safety" to the Village Board of

Trustees. Opp. Ex. 14, 1/30/06 Meeting Minutes. Lisle further contends that the "health and

safety" section of the Task Force's ensuing report was made available to the public on Lisle's

website and that it quoted Lisle Fire Chief Thomas K. Freeman as saying "the available water for

firefighting is woefully inadequate." Opp. Ex. 8, Task Force Report § 3.1.

Plaintiffs respond that the Task Force was created to investigate high water and sewer

prices, not fire protection issues and that its report made only a "modest reference" to fire

protection concerns limited to an area near the junior high school. Pl. Resp. to Surreply at 3.

Indeed, out of a twenty-page report, only six paragraphs are devoted to "Health and Safety."

Opp. Ex. 8 at 8-9. And those six paragraphs are not limited to a discussion of fire protection;

included in the same section is a discussion of discolored water and unsafe drinking water. *Id.* at

8. Plaintiffs also note that Lisle has offered nothing to suggest that any of the families who

rejected Lisle's offer to connect them to the municipal water service were aware of or received

the Task Force's report.

Lisle cites as further evidence of inadequate class representation the fact that "only 162 of

the 403 homes in Oak View" that Mrs. Srail contacted as part of a 2006 letter-writing campaign

asking IAWC to discontinue water service signed such letters. Lisle/IAWC Resp. at 14. Lisle

contends that all of this evidence "strongly suggests that many–and perhaps most–residents of

Oak View and Meadows may not want" the injunctive relief plaintiffs seek. *Id.* at 13.

The Court cannot draw such an inference based on the present record. The fact that eighteen families in the proposed Residential Class decided not to accept an offer to pay thousands of dollars to connect to Lisle's water system, when they may well have been entirely unaware of the core allegations underlying this suit, does not suggest that the injunctive relief plaintiffs seek would be unacceptable to most of the class, let alone that the plaintiffs are inadequate class representatives. Indeed, the evidence plaintiffs have provided leads the Court to the opposite conclusion. Contrary to Lisle's argument, the results of Mrs. Srail's letter-writing campaign demonstrate significant support for plaintiffs' desired relief. First of all, positive responses from 162 homes is a significant number, especially in view of the fact that the letter Mrs. Srail sent concerned only ownership of the water system and made no mention of fire safety issues. Furthermore, there is every reason to believe that even more homeowners would have sent in favorable survey responses had the letter-writing campaign been allowed to continue; once Mrs. Srail informed Lisle at a board meeting that she had received 162 favorable responses, Lisle directed her to cease her survey work and hire her own attorney if she wished to continue to pursue connection to the Lisle water system. *See* Pl. Reply at 8. And in any case, even if some residents were unconcerned about the fire safety issues plaintiffs allege, their lack of interest in injunctive relief would "'. . . not [be] relevant . . . because a judge may not refuse to certify a class simply because some class members may prefer to leave the violation of their rights unremedied.'" *Hispanics United of DuPage County v. Village of Addison*, 160 F.R.D. 681, 689 n.9 (N.D. Ill. 1995) (quoting *Martino v. McDonald's Sys., Inc.*, 81 F.R.D. 81, 85 (N.D. Ill. 1979)).

In addition, Lisle seems to ignore the fact that plaintiffs are seeking not only injunctive

relief, but damages compensating residents for the difference between what plaintiffs and class members have paid IAWC and what customers of Lisle's municipal water system pay Lisle. Lisle, citing no precedent, argues that plaintiffs must prove that class members want monetary relief. *See* Lisle's Mot. for Reconsid. at 6. But plaintiffs have already demonstrated that their claims are not in conflict with or antagonistic to the claims of other Oak View class members and that they have a sufficient interest in the outcome of the case to ensure that they will be vigorous advocates for the class. Rule 23(a)(4) contains no requirement that plaintiffs offer specific proof that potential class members would not oppose being compensated for the higher water rates plaintiffs allege they have been paying. And even if such a requirement existed, the Court can readily infer that the potential class members would welcome such compensation.

Lisle suggests that more potential absent class members "have not voiced support for a change in water service" because they may be concerned about the potential costs of a change. Lisle/IAWC Resp. at 14. Noting that plaintiffs have admitted they expect to bear some costs associated with a change in their water system, Lisle argues that the Court cannot assume others share plaintiffs' willingness to bear costs and that "the fact that these plaintiffs seek relief may impose a financial burden on absent class members suggests by itself that the named plaintiffs are inadequate." *Id.* (citing *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 511-12 (7th Cir. 1996)). *Kamilewicz*, however, had nothing whatsoever to do with class certification; in it, the Seventh Circuit merely noted that a state court judgment requiring plaintiffs who recovered less than $10 each to pay nearly $100 in fees seemed "questionable." 92 F.3d at 511. Furthermore, aside from the speculative nature of Lisle's argument, the point is not particularly significant in determining whether to certify a Rule 23(b)(3) class. If Lisle is right, and absent class members

truly do not wish to bear the costs that might result from a victory, they will have the opportunity to opt out of the litigation.

In making this observation, the Court is not, as IAWC has suggested, using the opt-out mechanism of Rule 23(c) to fudge compliance with the requirements of Rule 23(a).  Rather, the Court is merely stating what Rule 23, by its terms, explicitly provides: "the court will exclude from the class any member who requests exclusion."  Fed. R. Civ. P. 23(c)(2)(b)(v).  The notice to potential class members will be required to contain adequate "information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class."  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 338 (2d Cir. 2006) (quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977)).  If significant numbers of class members opt out, it may become necessary to revisit the subject of class certification or the issue of the appropriateness of a class-wide request for injunctive relief.  For purposes of class certification, however, Rule 23 does not require a court to find that most class members will not opt out.  This does not mean that the Court is, as IAWC contended in seeking reconsideration, engaging in a "certify now, worry later" approach to deciding class certification or in anything like "conditional" certification.  *See* IAWC Mot. for Reconsid. at 2.[4]  Rather, the Court is merely taking notice of the authority it has under Rule 23(c)(1)(C) to "alter[] or amend[] . . .[a]n order that grants or denies class certification . . . before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).

---

[4]  In *Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001), which IAWC cites in its motion for reconsideration, the Seventh Circuit criticized the district court for certifying a class "before making any of the determinations that Rule 23 makes prerequisite to certification."  *Id.* at 682. Such is not the case here.  As is evident from this decision, the Court has fully addressed all of the requirements for class certification.

Lisle also contends that the Srails and Brzeczeks are inadequate class representatives because their claims rely on the theory that all of the Residential Class members own the subject water systems. Lisle goes on to argue that plaintiffs' theory subjects potential class members to the full implications of being "public utilities" under Illinois law, with all the burdens that such status entails – burdens that, Lisle contends, many or most class members would not want to shoulder. The Court rejects the assertion that all of plaintiffs' claims turn on this theory. From the Court's review, it appears that the "ownership" theory was critical only to plaintiffs' now-dismissed Takings Clause claim under the Illinois Constitution.

Lisle argues the ownership theory is "vital" to plaintiffs' equal protection claims as well. Lisle Mot. for Reconsid. at 6. In support of this argument, Lisle notes two statements made in the third amended complaint, in the section entitled "Nature of the Case." *Id.* at 6-7. First, Lisle states, plaintiffs said that they were suing Lisle "because, even though it knew or should have known that the waterworks system was owned by area residents and not Illinois-American Water Company, it granted to the company a monopoly right to provide water to the Class Area, including the two schools." *Id.* at 6-7 (quoting 3d Am. Compl. at 2). Second, plaintiffs stated that "Illinois-American's entire presence in the Class Area is based on the company's repeated false claims that it owns the waterworks system . . . without which claims Illinois-American would not have been in a position to destroy the system through its recklessness and neglect." *Id.* at 7 n.3 (quoting 3d Am. Compl. at 3).

Read in context, the first statement clearly refers to the basis of plaintiffs' Takings Clause claim, not their Equal Protection Clause claim, the basis for which they explained in the preceding sentence of the complaint ("Specifically, the village of Lisle is sued because it has

violated the constitutional rights of these residents and schoolchildren, by refusing to afford them the properly-functioning water system that the Village has afforded other area residents and the students at its other schools."). 3d Am. Compl. at 2. The Court fails to see how the second quotation suggests the ownership theory is central to either plaintiffs' equal protection or negligence claims. Only in Count 5, plaintiffs' Takings Clause claim, do plaintiffs allege that the proposed Residential Class has a property interest in the water systems that serve their properties. 3d Am. Compl. ¶ 73. Further, nowhere in the complaint do plaintiffs claim a property interest in the water systems serving the schools. In any case, Lisle and IAWC's arguments about the ramifications of being a utility are of no consequence regarding the named plaintiffs' adequacy as representatives of the class; these points apply equally to all class members. Finally, plaintiffs are not seeking to operate the water system supplying their properties; they are simply asserting that they want water to be supplied to their properties from the municipal water system.

Plaintiffs contend that the Srails and Brzeczeks are adequate class representatives for the entire proposed Residential Class because they live within the same area and confront the same health and safety threats as other members of that class. It is true that the residents of Oak View and Meadows are supplied by the same IAWC water system. The factual distinctions between Oak View and Meadows residents previously discussed give rise to a legitimate concern, however, that the Srails and the Brzeczeks are not adequate representatives of Meadows residents: Oak View residents might well have an incentive to try to settle their own claims at the expense of those of Meadows residents or to discount arguments by Lisle focused on the appropriateness of any decision not to connect the Meadows subdivision, which is outside of Lisle's corporate limits, to the municipal system.

17

For these reasons, the Court concludes that the named plaintiffs have established their adequacy as representatives of the proposed Residential Class consisting of Oak View residents. Because of the conflict inherent in representing both Oak View and Meadows residents, however, the named plaintiffs have not shown that they are adequate representatives of a class including Meadows residents. As a result, the named plaintiffs may represent only a residential subclass consisting of Oak View residents. After the Court reached a similar conclusion in its now-vacated February 4 decision, it gave plaintiffs an opportunity to designate new representatives of a potential Meadows residential subclass. Plaintiffs subsequently advised the Court that they do not intend to do so. The Court's order on the present motion therefore will dismiss any class claims brought on behalf of Meadows residents.

Lisle contends that the Srails and Brzeczeks cannot adequately represent the Schoolchildren Class if they also represent the Residential Class. They argue that representation of both classes by the same individuals would create a conflict of interest, because injunctive recovery for the Residential Class would impose costs on members of the Schoolchildren Class living outside of the Residential Class area (presumably, although not explicitly stated, through taxes on residents of the relevant school districts to cover costs associated with injunctive relief). Plaintiffs respond that under this reasoning, a resident could never assert a class claim against his or her municipality unless all village residents were class members. The Court agrees; any indirect cost that injunctive relief for the Residential Class might impose on members of the Schoolchildren Class living outside of the Residential Class area – along with all other Lisle taxpayers – is far too speculative to give rise to a disabling conflict of interest for class certification purposes. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("A

18

conflict or potential conflict alone will not . . . necessarily defeat class certification–the conflict must be 'fundamental.'") (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001)). Because plaintiffs have children attending the same schools as the children of other potential members of the Schoolchildren Class, and because any injury they may have experienced as a result of Lisle's actions would be identical to that suffered by other potential class members, plaintiffs have established their adequacy as representatives of the proposed Schoolchildren Class.

**2.      Rule 23(b)(3) Requirements**

Plaintiffs seek certification under Rule 23(b)(3). They contend that questions of law or fact common to the members of each class predominate over any questions affecting only individual members, and that a class action is superior to other methods of adjudicating each class's claims.

**a.      Predominance**

Common questions predominate when the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. The predominance criterion of 23(b)(3) is "far more demanding" than Rule 23(a)(2) commonality, though the two inquiries are related. *Id.* at 623-24. However, "[w]hen a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation." *Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920, *7 (N.D. Ill. Apr. 25, 2007).

Lisle contends that individual questions predominate over common questions with respect to the proposed Residential Class because, in Lisle's view, residents will have to advance

individualized proof concerning several issues. First, Lisle argues that each plaintiff will have to prove that he or she (not IAWC) owned the water mains at his or her residence and that Lisle, in turn, will offer evidence in defense that will differ as to each homeowner. As the Court has noted, however, the only claim to which ownership of the system appears to have been significant is plaintiffs' now-dismissed Takings Clause claim.

On the present record, any potential need for individualized proof of ownership is unforeseeable—indeed, it is speculative. There is no basis to conclude that this point is in the least bit likely to be a significant focus of the litigation or to predominate over common questions concerning Lisle's conduct. Rather, the contrary is true. The focus of the claims of each class concerns the basis for Lisle's decision not to extend municipal water service to the areas in question. There is nothing in the record to suggest that Lisle's rationale is individualized on a home-by-home basis; logic suggests exactly the opposite. *See Davidson v. Citizens Gas & Coke Util.*, 238 F.R.D. 225, 233 (S.D. Ind. 2006) (noting that to satisfy the predominance requirement, "issues that are subject to generalized proof must predominate over issues requiring individualized proof")).

Lisle's second argument on predominance—to which it and plaintiffs have now devoted several supplemental briefs—is that plaintiffs have no admissible evidence that the substandard water pressure they allege is uniform throughout the areas covered by the classes. Lisle contends that the Srails' and Brzeczeks' admissible evidence does not reflect a system-wide problem and that each resident therefore will be forced to establish on an individual basis that his or her particular part of the system is substandard.

Lisle initially argued in its response opposing class certification that neither the deposition

testimony of Village Manager Gerald Sprecher nor the declaration of Fire Chief Freeman supports plaintiffs' allegations of uniform water flow problems. It contended that Sprecher's statements merely parrot what he has heard from fire district personnel and that he admitted that he lacks the expertise and information to comment on the system's fire-fighting sufficiency. Lisle also argued that Freeman's testimony on the overall inadequacy of the water system for fire-fighting purposes would be inadmissible at trial because he is not a water system specialist and did not provide adequate information about the basis for his conclusions. Even if Freeman's testimony were admissible, Lisle contended, it would still be insufficient to support plaintiffs' contentions about defective residential water service. Furthermore, Lisle argued, the deposition testimony of Deputy Fire Chief Vavra and the declaration of IAWC's expert Richard Riethmiller constituted affirmative evidence contradicting plaintiffs' allegations regarding uniformity. According to Lisle, Vavra could not identify a single Oak View street that worried him and, in fact, did not know of any existing fire hydrant problems. Lisle also contended that Riethmiller's test results showed that the residential water pressure in the Srail and Brzeczek households is more than adequate.[5] To the extent that Lisle's arguments concern residential water pressure, the Court notes that plaintiffs have limited their equal protection and negligence claims to the water system's ability to put out fires reliably; they are not asserting claims based on water pressure for household use.

Plaintiffs argued in their reply in support of their motion for class certification—to which they added a supplemental affidavit from Fire Chief Freeman and a new expert report from Mark

---

[5] For purposes of this decision, the Court considers Riethmiller's declaration, although it is unclear whether Lisle will end up using an expert retained and paid by IAWC.

T. Gasser,[6] *see* Pl. Reply, Exs. 1 & 2—that the ultimate issue of whether the Srails or Brzeczeks will prevail on their own claims or the class claims is not an issue the Court should consider as part of the predominance inquiry. In his supplemental affidavit, Freeman opines that based upon his review of the fire district's fire flow tests of the IAWC system, as well as the tests Gasser conducted, "water flows remain insufficient in representative areas to provide reliable and adequate fire fighting protection throughout the Oak View and Meadows subdivisions." *Id.*, Ex. 1 at 2. Gasser's report, which he completed after reviewing "documents received during discovery" as well as "all available historical hydrant flow test results" and his "own hydrant flow tests," concludes that the water system operated by IAWC in Oak View and Meadows is and has been "inadequate and unreliable for fire fighting purposes" since at least 1993. *Id.*, Ex. 2 at 2.

Lisle contended in its surreply, however, that Gasser's report "highlights the lack of uniformity in the water system" because eleven of the twelve fire hydrants he tested demonstrated different flows. Surreply at 2. It argued that the evidence plaintiffs present in support of their class allegations is inadequate to demonstrate predominance and that such evidence "cannot be

---

[6] IAWC argued in its motion for reconsideration that plaintiffs sandbagged Lisle and IAWC by submitting Freeman's second affidavit in their reply in support of their motion for class certification, rather than attaching it to their opening memorandum.

In relying on this declaration, IAWC argued, the Court committed a "clear error of law and a manifest injustice." IAWC Mot. for Reconsid. at 7.

In the time since plaintiffs filed their reply, however, Lisle and IAWC have submitted a surreply, separate motions for reconsideration, and separate replies in support of their motions for reconsideration. Later, after Lisle and IAWC filed motions to exclude the testimony of, respectively, Gasser and Freeman, the Court gave plaintiffs an opportunity to respond to the arguments Lisle and IAWC had made regarding the admissibility of their testimony. Each side filed two briefs on the issue. Because Lisle and IAWC have had a more-than-ample opportunity to respond to all of plaintiffs' evidence, including Fire Chief Freeman's affidavit, plaintiffs' argument based on Fire Chief Freeman's affidavit is not forfeited. *See Kelso v. Bayer Corp.*, 398 F.3d 640, 643 (7th Cir. 2005).

ignored when determining . . . whether . . . individual hearings relating to water flow would be necessary to determine whether any particular class member suffered any compensable injury (thus destroying predominance)." *Id.*

The Court agrees with plaintiffs that at this stage, it need not evaluate whether plaintiffs will prevail on their individual claims or the class claims. In determining class certification, a court need not accept all of the allegations of a plaintiff's complaint as true and "should make whatever factual and legal inquiries are necessary under Rule 23" to ensure that all of its requirements are met. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) . When "some of the considerations under Rule 23(b)(3) . . . overlap the merits," such that it is not possible to evaluate whether plaintiffs satisfy Rule 23(b)(3)'s criteria without probing into the merits, "then the judge must make a preliminary inquiry into the merits." *Id.* A court assessing whether to certify a class should not, however, conduct a general inquiry "into the merits of [a] plaintiff's particular individual claim." *Id.* at 677 (quoting *Eggleston v. Chi. Journeymen Plumbers' Local No. 130*, 657 F.2d 890, 895 (7th Cir. 1981)). Instead, the Court's inquiry should be a "limited one that has as its focus . . . whether the path that will need to be taken to decide the merits renders the case suitable for class treatment." *Harris v. Circuit City Stores, Inc.*, No. 07 C 2512, 2008 WL 400862, *3-4 (N.D. Ill. Feb. 7, 2008) (citing *Humphrey v. Int'l Paper*, No. 02 C 4147, 2003 WL 22111093, *3 (N.D. Ill. Sept. 11, 2003)). Thus, the Court will not evaluate at this juncture whether plaintiffs are likely to prevail at trial on their claim that the IAWC water system is inadequate, throughout the class areas, for fighting fires. To do so would require a premature determination on the merits. The Court will examine, however, whether plaintiffs' admissible evidence shows that the class claims are suitable for class-wide proof, such that common issues

will predominate over individual ones.

The parties dispute whether performing such an analysis requires the Court to assess, at this stage, the admissibility at trial of Gasser's expert report and Freeman's opinion testimony.[7] Lisle asserts that Gasser's report would not be admissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), because, essentially, his methodology is so flawed that it would not be helpful to a jury. Thus, Lisle concludes, the report should not be given any weight when analyzing Rule 23 factors. Lisle also argues that the Court should not consider Freeman's second declaration because his testimony relies largely on Gasser's report and as a result would fail a *Daubert* challenge as well.

Under *Daubert*, a court determining whether an expert opinion is admissible in evidence must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. The Seventh Circuit has warned that courts should not allow plaintiffs to obtain class certification "just by hiring a competent expert"; it is insufficient for a court merely to point out "that each side has the support of a reputable [expert]" as if "the clash . . . by itself . . . support[ed] class certification and a trial on the merits." *West v. Prudential Secs., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002). The Court therefore addresses Lisle's arguments regarding the admissibility and adequacy of plaintiffs' proffered evidence of the

---

[7] Although Lisle and IAWC filed separate motions for reconsideration, Lisle adopted by reference those of IAWC's arguments that were relevant to plaintiffs' suit against Lisle. Lisle Mot. for Reconsideration at 2. IAWC moved to exclude the opinion testimony of Freeman, and IAWC and Lisle each moved to exclude the expert testimony of Gasser.

system-wide inadequacy of the water system.[8]

Plaintiffs argue that the Court need not reach the question of the admissibility of their witnesses' testimony because the statements of Lisle officials over the years and during third-party litigation with IAWC constitute admissions that the Oak View water system is inadequate to fight fires. In addition, plaintiffs argue that Lisle's challenge to Gasser's testimony should be rejected because Lisle, like Gasser, relied on fire flow test results when it informed the Illinois Attorney General, the citizens of Lisle, and this Court that Oak View's water system was inadequate. Plaintiffs also argue, however, that Gasser's testimony is admissible under *Daubert*. Finally, plaintiffs assert that because of his personal experience as a Lisle's Fire Chief, Freeman may testify as a fact witness even if he draws conclusions in his testimony. And even if he is deemed an expert under Federal Rule of Evidence 702, plaintiffs argue, Freeman's testimony should be considered despite their failure to designate him as an expert under Rule 26(a)(2), because any such non-disclosure was justified or harmless.

Lisle contends that plaintiffs have failed to show that the inadequacy of the water system for fire-fighting can be proven on a class-wide basis and that this failure is fatal to plaintiffs' motion for class certification. In particular, Lisle asserts that plaintiffs have presented no admissible expert evidence that Oak View's water system is inadequate or that it has been inadequate historically. Lisle also challenges plaintiffs' contention that they can satisfy the predominance requirement of Rule 23(b)(3) even without expert testimony through the testimony of various lay witnesses.

---

[8] Neither side has requested an evidentiary hearing on the *Daubert* issue as it relates to class certification; both sides are content to rely on their written submissions.

### i.     Statements by Lisle representatives

Plaintiffs argue that the following statements by Lisle representatives constitute admissions regarding the sufficiency of Oak View's water supply:  Lisle's third-party complaint against IAWC, in which it essentially accused IAWC of failing to maintain proper water pressure within the system and ensure that the fire hydrants were functional; the depositions of Sprecher, Assistant Village Manager Mary Lou Kalsted, and Director of Public Works Ray Peterson; excerpts from letters written by Lisle Mayor Broda to Attorney General Lisa Madigan and to State Representative James H. Meyer; the Water Task Force's report; and a statement at a public meeting in 1982 by then-Lisle Mayor George Varney.

Lisle attacks this evidence on several grounds.  First, it contends that a third-party complaint cannot be used as an admission, citing *Douglas Equipment, Inc. v. Mack Trucks, Inc.*, 471 F.2d 222, 224 (7th Cir. 1972).  The court in *Douglas Equipment* found no error in the trial court's refusal to admit answers to a third-party defendant's interrogatories when those answers "were obviously conditioned on the hypothetical establishment of Mack's liability to Douglas, which was not conceded by Mack."  *Id.* at 225.  The Court agrees with Lisle.  Because the allegations in Lisle's third-party complaint against IAWC were clearly predicated upon a finding that Lisle is liable to plaintiffs—which Lisle disputes—they may not be used as admissions against Lisle in plaintiffs' suit.

Next, Lisle contends that the statements plaintiffs cite contain conclusions that are not based on the witnesses' own perceptions, as Federal Rule of Evidence 701(a) requires for lay testimony.  *See* Fed. R. Evid. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which

are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 402."). The rule that a witness's opinion must "be rationally based on the witness's perception is 'the familiar requirement of first-hand knowledge or observation.'" *United States v. Wantuch*, __ F.3d __, No. 06 C 3681, 2008 WL 1902098 at *6 (7th Cir. May 1, 2008) (quoting Rule 701(a) Advisory Committee Note). "Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying." *Id.* (citing *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002)).

The cited testimony by Sprecher includes his response "I think generally that is probably—that is a true statement" to the question of whether the Village of Lisle "believes that the water pressure furnished to Oak View residents and the schools in Oak View by the Illinois-American water system is inadequate to fight a fire." Pl. Supp. Br., Ex. A, 8/7/07 Sprecher Dep. at 59:7-13. Plaintiffs also cite Sprecher's statements that he would "[p]robably not" want to live in a neighborhood with a water system similar to Oak View's, *id.* at 87:19-22, that "part of the reason" Lisle offered to connect the schools to the Lisle water system was because the IAWC water system is "inadequate in the Village's judgment," *id.* at 110:20-111:1, and that there had been problems with the water system in Oak View and Meadows for "at least ten years." Pl. Supp. Br., Ex. B, 10/23/07 Sprecher Dep. at 151:9-20.

In its response, Lisle cites testimony from other parts of Sprecher's deposition in which, Lisle contends, he reveals that his opinions are not based on personal observations. For example, Sprecher states that his opinion as to the fire-fighting capacity of the IAWC system in Oak View

and Meadows is "based entirely on the observations of the fire administration."  Lisle Resp. to Pl. Supp. Br., Ex. C, 10/23/07 Sprecher Dep. at 35:2-13.  Sprecher also states that Lisle would "defer to the fire district as to whether or not there is adequate water available to fight fires at the school" and at homes in Oak View and Meadows.  *Id.* at 59:2-9.

Even taking into consideration Sprecher's acknowledgment that he and Lisle rely on the fire district to determine whether the IAWC water system is adequate, Sprecher's statements likely are admissible to the extent that they reflect his understanding of the Village's views on the adequacy of the water system—rather than his personal assessment of the adequacy of the water system.  That said, the statements by Sprecher that plaintiffs cite are not particularly probative of the issue of predominance.  In other words, they do not carry much weight in an evaluation of whether the adequacy of the water system in the class areas is susceptible to class-wide proof. Rather, Sprecher's comments bear more on Lisle's historical concerns about the water system.

The only testimony plaintiffs cite from Kalsted is her response—"No"—to the question, "The water system in Oak View and The Meadows, including fire hydrants and including water mains, does not meet Village of Lisle standards, does it?"  Pl. Supp. Br., Ex. C, Kalsted Dep. at 221:13-17.  Lisle asserts that Kalsted's testimony denies the inadequacy of the water system, but it does not elaborate further on this point, and its basis for the assertion is unclear to the Court. As the Assistant Village Manager of Lisle, Kalsted may well be able to draw such a conclusion based on her own perceptions, if a proper foundation is laid for such testimony.  The Court cannot say at this point that her testimony is inadmissible under Rule 701(a).

Plaintiffs also cite only a single question and answer from Peterson's deposition.  When asked whether water flow test results demonstrated "an acceptable flow for firefighting purposes

at a school," Peterson replied, "My understanding of a school would be that that would be low." *Id.* Ex. D, Peterson Dep. at 22:11-18. Peterson's excerpted testimony does not bear on the predominance of common issues with regard to the residential class and is therefore not relevant for that purpose.

Mayor Broda's 2006 letters to Attorney General Madigan and State Representative Meyer both describe the Lisle Water Task Force's finding that the IAWC water system provides inadequate fire protection. *See id.*, Exs. E & F. Former Mayor Varney's statements at a 1982 public meeting express his conclusion that the water system has always been inadequate and that Lisle's water system is superior. Lisle challenges the admissibility of the Broda letters on the ground that they are inadmissible hearsay, citing two district court cases from Texas that found mayoral statements to be hearsay. *See Dickinson Leisure Indus., Inc. v. City of Dickinson*, 329 F. Supp. 2d 835, 848 (S.D. Tex. 2004); *Jim Sowell Constr. Co. v. City of Coppell, Tex.*, 61 F. Supp. 2d 542, 550-51 (N.D. Tex. 1999). In *Dickinson Leisure*, however, the court held inadmissible the out-of-court, second-hand statements of four public officials when their proponent attempted to introduce them without indicating that any of the declarants had personal knowledge of the subject of their statements. *Dickinson Leisure*, 329 F. Supp. 2d at 848. The statements excluded by the court in *Jim Sowell* were newspaper articles that merely "purport[ed] to quote the Mayor." 61 F. Supp. 2d at 550.

Unlike the statements excluded in *Dickinson Leisure* and *Jim Sowell*, Broda's statements are first-hand: they are contained in letters written in his official capacity as Mayor, using official Village of Lisle letterhead. Generally, the Federal Rules of Evidence exclude as hearsay "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in

evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). A statement may

qualify as an admissible statement by a party-opponent, however, if it is "offered against the party

and is (A) the party's own statement . . . or (D) a statement by the party's agent or servant

concerning a matter within the scope of the agency or employment, made during the existence of

the relationship . . . ."). Fed. R. Evid. 801(d). Broda's letters represent his own statements,

concern a matter within the scope of his employment—water service to some of the residents of

his town—and were sent during his time in office. They are therefore admissible as admissions

by a party-opponent. Lisle does not challenge the admissibility of Varney's statements in the

meeting minutes, and the Court finds that they are admissible. *See Gazarkiewicz v. Town of

Kingsford Heights, Indiana*, 359 F.3d 933, 946 (7th Cir. 2004) (giving "substantial weight" to

meeting minutes as "contemporaneous, official notations").

> ii.     **Testimony of Gasser**

Plaintiffs assert that Lisle's own use of Gasser's method—analyzing fire flow test

results—in its third-party complaint against IAWC, in Broda's letters, and in the Water Task

Force report, shows that Lisle considers the method reliable, thus undermining its *Daubert* attack

on Gasser's testimony. Plaintiffs, citing *Saad v. Shimano Amer. Corp.*, No. 98 C 1204, 2000 WL

1036253 (N.D. Ill. Jul. 24, 2000), argue that further *Daubert* analysis is not even necessary

because Lisle used the same methods and reached the same conclusions as Gasser. *Id.* at *5-6.

The court in *Saad*, in assessing the plaintiff's challenge to the defendant's expert, did note the

similarity between the two parties' expert opinions. *Id.* at 5. It did so, however, in the course of a

partial *Daubert* analysis. The comment was made during the court's discussion of the first

*Daubert* factor, namely, "'whether [the expert's theory] can be (and has been) tested.'" *Id.*

(quoting *Daubert*, 509 U.S. at 593).  The court did not end its analysis there.

In their most recent submission, plaintiffs also urge the Court to consider the report of Lisle's own expert, Jeffrey Harper, who plaintiffs contend relied almost exclusively on the 2007 fire flow tests that Gasser performed.  Lisle responds that Harper in fact relied on multiple sources, not just on Gasser's test results.  Because Gasser's results purportedly corroborated Harper's findings—although these findings were contrary to Gasser's—Lisle states that there was no reason for Harper to challenge Gasser's methodology.  This does not mean, Lisle contends, that Harper agreed that Gasser's methodology was sound.  The Court agrees that Harper's reference to Gasser's test results in his own expert report does not end the inquiry into the admissibility of Gasser's report.  As the Court discusses later, however, Harper's use of Gasser's flow tests does provide some support for the proposition that those test results have some level of reliability.

Plaintiffs argue, however, that even if the Court addresses Lisle's *Daubert*-based criticisms of Gasser, his opinion is still admissible.  The Court's gate-keeping function under *Daubert* requires it to perform a two-step analysis before it admits expert testimony under Rule 702.  *Chapman v. Maytag Corp.*, 297 F.3d 682, 686 (7th Cir. 2002).  The Court must first analyze whether the proposed testimony is reliable by assessing whether the expert is qualified in the relevant field and examining the expert's methodology.  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  Second, the Court must determine "whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue."  *Chapman*, 297 F.3d at 687 (quoting *Porter v. Whitehall Labs, Inc.*, 9 F.3d 607, 616 (7th Cir. 1993)).

Lisle contends that Gasser's testimony does not satisfy the first step of the analysis.

Gasser conducted his testing as follows.  First, Gasser reviewed available historical fire flow data and compared it to a map of the system produced by IAWC.  Next, Gasser measured the water flow and pressure at twelve randomly selected pairs of fire hydrants that had not been tested previously in Oak View and Meadows.  One hydrant of each pair was used for flow testing and the other for residual pressure testing.  After he completed the testing, Gasser compared the flow results to a baseline standard of 1,000 gallons per minute and found that three of the twelve hydrants had tested below this level.  One hydrant had a flow of 841 gallons per minute, another had 808 gallons per minute, and the third had 938 gallons per minute.  Based on these results, Gasser concluded that there was a 25 percent failure rate in the water system and that the system was thus inadequate for fighting fires.

In its separately-filed motion to exclude, Lisle argues that Gasser is not qualified to offer such an opinion because his educational background and profession are "of a different *genre* than his proffered testimony"; he has never prepared an expert report or appeared as an expert witness before this case; he is not a professional engineer and has taken only two undergraduate-level engineering classes; and he has applied no science to his study.  Lisle Mot. to Excl. Testimony of Gasser at 7.  Lisle further argues that Gasser's methodology was unsound because aside from attempting to choose hydrants that were spread out throughout the subdivisions, he selected them at random; he did not supply a rationale for the number or percentage of hydrants he chose to test; and he applied a baseline standard that Lisle contends had no particular relevancy to his study.  More specifically, Lisle asserts that the Lisle Village Ordinance from which Gasser borrowed the flow criterion that he used in the study applies only to new construction.

Plaintiffs assert that Lisle's criticism of Gasser's qualifications should be rejected

because, for one thing, if Rule 702 only permitted testimony from those who have served as expert witnesses in the past, no one would ever qualify to testify as an expert. Plaintiffs further contend that because Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience," Gasser's two decades of fire fighting and water system experience qualify him as an expert. Pl. Supp. Br. at 7-8 (quoting, without citation, *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000)). Plaintiffs note that Gasser has not only performed hundreds of fire flow tests while studying the adequacy of other water systems, but has worked on the construction of water systems as well. In addition, plaintiffs point out that Gasser is certified by the National Fire Protection Association ("NFPA") as a fire protection specialist and as such has been examined on, among other topics, fire flow testing.

The Court agrees with plaintiffs that Gasser's decades of practical experience in the fire protection field qualify him to offer his opinion about this matter. The fact that he is not a registered engineer arguably may affect the weight a factfinder ultimately gives his testimony, but it does not preclude him from testifying as to the results and conclusions he drew from the fire flow tests that he performed. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Smith*, 215 F.3d at 718 ("[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.").

Plaintiffs also dispute Lisle's assertion that Gasser's methodology is unreliable and irrelevant. According to plaintiffs, Gasser's testing, including his selection of which hydrants to test, comports with the NFPA handbook for performing fire flow tests. Furthermore, plaintiffs

contend that the number of hydrants Gasser used for testing purposes far exceeds the three or four

hydrants used by the Insurance Services Office when it tests the entire Lisle Woodridge Fire

Protection District every ten to fifteen years.[9]  As to Lisle's contention that the 1,000 gallon per

minute flow criterion that Gasser used is irrelevant, plaintiffs respond that this standard is a

"broadly published minimum level of protection for fire fighting purposes."  Pl. Supp. Br. at 10.

In this regard, plaintiffs have provided excerpts from three publications:  the ISO Fire

Suppression Rating Schedule, which states that 1,000 gallons per minute are required for one- to

two-story houses between eleven and thirty feet apart, *id.*, Ex. P at 10; the 2003 International Fire

Code, which sets out essentially the same standard, *id.*, Ex. Q at 371, and the Uniform Fire Code

of the NFPA, which also specifies a 1,000 gallon per minute standard, *id.*, Ex. R.

Lisle contends that the ISO standard is inapplicable because ISO is simply a private

insurance underwriting entity.  Lisle also contends that the NFPA and IFC standards are not

applicable to the Oak View residential class area because they set out a minimum flow per

dwelling, not per hydrant, and because they apply only to homes built after the adoption of the

standard.  Because Oak View is not filled with newly constructed homes, Lisle concludes that

none of the 1,000 gallon per minute standards apply.  At the same time as it states that the NFPA

standards do not apply, however, Lisle also asserts that Gasser failed to comply with all NFPA

standards during the course of his testing.  First, Lisle says that Gasser he did not state that he

located the residual hydrant in each pair between the hydrant whose flow he tested and the large

mains supplying water in the immediate area, as NFPA 291 requires.  Lisle also contends that

---

[9]  The Insurance Services Office is an underwriting entity that, according to Lisle "makes recommendations for underwriting and pricing for property insurance."  Lisle Resp. to Pl. Supp. Br. at 4.

plaintiffs have provided no evidence to confirm that the pressure gauges they used in the flow

tests were calibrated within the last twelve months, as NFPA 291 requires.

When considering the validity of an expert's methodology under *Daubert*, a court should

consider "(1) whether the theory can be and has been verified by the scientific method through

testing; (2) whether the theory has been subjected to peer review; (3) the known or potential rate

of error; and (4) the general acceptance of the theory in the scientific community." *Chapman*,

297 F.3d at 687.   There is no requirement, however, that testimony satisfy every one of these

factors.  *See United States v. Vitek Supply Corp.*, 144 F.3d 476 (7th Cir. 1998).

The Court finds that Gasser's methodology is sufficiently reliable for the Court to

consider his report.  His conclusion—that the IAWC water system is inadequate for fighting

fires—has been verified through testing of twelve pairs of hydrants in Oak View and Meadows.

Though Lisle challenges the adequacy of this sampling and the use of a random selection process,

the NFPA publication on fire flow testing makes no particular recommendations as to what

percentage of hydrants in a given area should be tested or how those hydrants should be selected.

Rather, it states that "a group of test hydrants in the vicinity is selected" and that the "number of

hydrants to be used in any test depends upon the strength of the distribution system in the vicinity

of the test location."  Pl. Supp. Br., Ex. N, NFPA Recommended Practice for Fire Flow Testing

and Marking of Hydrants, Chapter 4 (2007), 4.3.1 & 4.3.5.  Thus the manner of Gasser's selection

of hydrants does not suggest that the selection process was flawed or that it failed to meet

recognized standards.

Although Lisle argues that his method has not been subjected to peer review, Lisle's own

expert, Harper, drew in part on Gasser's test results to draw his own conclusions as to the

adequacy of the water system. In addition, the fact that Gasser's test procedure was consistent with general industry standards and practices as described in the NFPA handbook supports the proposition that the methodology Gasser employed enjoys general acceptance in the relevant scientific community. In sum, although plaintiffs have not provided information on the potential or known rate of error of Gasser's testing, the Court finds that Gasser's report is both relevant and based on sufficiently reliable methodology and valid for the Court to consider it insofar as it bears on the analysis of class certification.

Lisle also contends, however, that Gasser's testimony fails the second part of the *Daubert* inquiry. According to Lisle, Gasser's testimony is more likely to confuse than to aid a trier of fact because, Lisle contends, his conclusions about the water flow testing he conducted do not shed light on why the water system is inadequate for firefighting purposes. The Court disagrees. To assist the trier of fact, the proposed testimony must "'fit' the issue to which the expert is testifying." *Porter*, 9 F.3d at 616. Gasser's testimony concerns the adequacy of the IAWC water system for firefighting purposes. To that end, plaintiffs propose to have him testify about the water flow in various fire hydrants in the class area. His testimony therefore fits the issue on which he proposes to testify.

In IAWC's motion for reconsideration, which Lisle adopted, IAWC objected to Gasser's suggestion that a failure rate of 25% of the area's fire hydrants indicates a system-wide problem with the water supply for fire fighting purposes and to Gasser's failure to test the hydrants closest to the named plaintiffs' residences. In particular, IAWC challenged whether the inference that a 25% failure rate indicates systemic fire-fighting inadequacy can be drawn from the data he collected. *Daubert*, however, does not require a court to admit or exclude evidence based on its

36

persuasiveness but rather requires a court to admit or exclude evidence based on its scientific reliability and relevance." *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1179 (9th Cir. 2007). Plaintiffs ultimately may be unable to persuade a factfinder that Gasser's testimony should carry the day, but that does not make his testimony inadmissible under *Daubert*. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [arguably] shaky but admissible evidence." *Daubert*, 509 U.S. at 596. For the same reason, the Court rejects Lisle's argument that Gasser's opinions are based on inadequate facts simply because, now that Meadows is no longer part of this case, only six of the hydrants Gasser tested are in the class area of Oak View. That might affect the weight to be given to Gasser's testimony, but it does not undercut its admissibility.

Gasser's report suggests that the inadequacy of fighting fires in each class member's home is not determined by the flow of the nearest fire hydrant. The hydrants in Oak View and Meadows with inadequate water flow for residential fire protection were "dispersed throughout the Class area," and, according to Gasser, the twenty-five percent failure rate "indicates that the inadequate water supply for fire fighting purposes is a systemic issue throughout the Illinois American system in the Class area." Pl. Reply, Ex. 2 at 5. Whether the conclusions Gasser draws based on his analysis of the tests he performed and the historical data he reviewed are correct is a matter to be determined by the trier of fact, not the Court. *See Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595 ("The focus, of course must be solely on principles and methodology, not on the conclusions that they generate.")). The question of whether plaintiffs ultimately will persuade and prevail is not one the Court can or should determine at this time; it does not govern whether plaintiffs have met the predominance requirement of Rule 23(b)(3).

### iii.    Testimony of Freeman

Lisle also challenges the admissibility of the testimony and affidavits of Freeman, a witness for plaintiffs who has been the Fire Chief of the Lisle-Woodridge Fire District since 1994. Lisle contends that plaintiffs improperly seek to introduce specialized opinion testimony through a lay witness. Freeman testified in his deposition that he has directly observed a variety of problems in the Oak View water system, including broken fire hydrants, broken valves, and clogged pumps and mains. Pl. Supp. Br., Ex. U, Freeman Dep. at 210:11-23; 212:9-23, 221:15-223:20. Freeman also testified that he has himself performed water pressure tests that revealed insufficient water pressures and volumes. *Id.* at 60:23-61:24, 71:3-23. In addition, plaintiffs state that Freeman has personal knowledge of fires in the area served by the IAWC water system that were difficult to extinguish due to problems with water pressure or volume.

Freeman's conclusions on the adequacy of the IAWC water system in the class area for fire-fighting purposes are admissible under Rule 702, even if they might not be admissible under Rule 701, a matter the Court need not determine.[10] First, Freeman's opinions are helpful to a determination of a fact in issue in the case—the adequacy of the system for fire-fighting purposes. Second, his experience and training certainly qualify him to impart his knowledge and conclusions at this point, something that Lisle, where he serves as Fire Chief, can hardly question.

---

[10] To the extent Lisle contends Freeman's testimony should be excluded due to lack of proper disclosure under Rule 26(a)(2), the Court rejects the argument. First, Freeman was not required to submit a report under Rule 26(a)(2)(B) because he is not "retained or specially employed to provide expert testimony" and his duties do not "regularly involve filing such testimony." Second, assuming for purposes of discussion that plaintiffs did not specifically identify Freeman as an expert under Rule 26(a)(2)(A), that is plainly harmless, as it has been clear for months that plaintiffs intend to rely on his opinions, and Lisle has had ample opportunity to take Freeman's deposition.

And finally, given his extensive knowledge of the Lisle water system and its use for firefighting, the Court is satisfied that his opinions are based on sufficient data and are the product of reliable methods and principles and that he has applied those methods and principles reliably. In the Court's view, Lisle's objection goes to the weight a factfinder should give Freeman's testimony, not to its admissibility. Although, standing alone, Freeman's testimony might not be sufficient to establish that the inadequacy of the water system can properly be tried on a class basis, such that common issues predominate over individual ones, it buttresses plaintiffs' showing that common issues predominate.

Under the circumstances, Lisle's contention that water flow is not identical throughout the system in the area at issue provides no basis to believe that common issues will not predominate. Based on their submissions, plaintiffs have made a sufficient showing that potential variations in flow from different hydrants in the class area do not defeat the predominance of common issues over individual ones. Rather, the Court finds, based on its conclusions regarding the admissibility of plaintiffs' proffered evidence, that their claims are susceptible of classwide proof.

Lisle also contends that whether particular persons ever asked to be connected to the municipal water system—an assertion that Lisle says must be the predicate of an equal protection claim—must be proved on an individual basis. Even if that sort of evidence were required, a matter on which the Court is dubious, it would be highly unlikely to occupy much time in either pretrial discovery or at trial, as any such requests likely would be documented in some way. In any event, as plaintiffs note, their equal protection claim does not depend on evidence that they or anyone else specifically asked Lisle to provide them with municipal water service.

In sum, the Court finds that plaintiffs have made a showing sufficient to establish they can

appropriately assert, on a class-wide basis, the systemic inadequacy of the IAWC water system. As a result, plaintiffs satisfy the predominance requirement of Rule 23(b)(3).

With regard to the proposed Schoolchildren Class, Lisle contends plaintiffs cannot satisfy the predominance requirement of 23(b)(3) because the class's purportedly shared concern about the water system has been rendered moot by later developments. Specifically, Lisle notes that IAWC has made ongoing upgrades of the portions of the water main surrounding the schools, replaced many hydrants, and created a mechanism allowing water to flow from Lisle's system to the IAWC system when necessary. As a result of all of these changes, it contends, recent testing reveals adequate water pressure in the hydrants serving the two schools. In its response to plaintiffs' supplemental brief, Lisle argues again that plaintiffs have failed to present any admissible expert evidence that the schools are not adequately protected by accessible fire hydrants.

It is fairly obvious that these arguments actually concern the merits of the claims of the proposed class, not the predominance requirement. Even if Lisle is correct, the point is plainly common to all class members and does not suggest that individual issues predominate. Were the issue somehow actually connected to the predominance requirement, the declaration of Fire Chief Freeman and the deposition of Village Manager Sprecher, both of which indicate that the water system servicing the schools is inadequate to fight fires, are sufficient to sustain plaintiffs' burden of showing that common issues predominate.

For these reasons, the Court finds that plaintiffs have satisfied the predominance requirement of Rule 23(b)(3) for the Schoolchildren Class and for a Residential Class consisting of Oak View residents.

###### b. Superiority

A class action is a superior method of adjudication when "economies of time, effort, and expense" are achieved "without sacrificing procedural fairness." *Amchem Prods.*, 521 U.S. at 614. Contrary to Lisle's contentions, plaintiffs have shown that a class action is the superior method of pursuing plaintiffs' claims with respect to both proposed classes. Given the numbers of potential class members in each class, this is a case in which "class action treatment is appropriate and . . . permitted by Rule 23 [because] the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury." *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 911 (7th Cir. 2003).

Lisle contends that the proposed Residential Class fails to satisfy the superiority requirement for two reasons: manageability problems, and the superiority of the Illinois Commerce Commission ("ICC") as a forum for resolving plaintiffs' complaints. Lisle's argument concerning manageability revolves around the issues of ownership, substandard service, histories of service change requests, and damages. The Court has already addressed all but the last of these issues. Lisle contends that plaintiffs' individual claims may have significant value if the deterioration to their properties is as severe as alleged and that determining these values would require complex individualized calculations and proofs of ownership. Lisle also contends that plaintiffs' claims for emotional distress damages are ill-suited to class-wide proof. In their reply brief, however, plaintiffs have limited the compensatory damages they seek to those attributable to the rate differential between IAWC's and Lisle's respective charges for water service. Pl. Reply at 17. As a result, Lisle and IAWC's arguments on this point are effectively moot. Rate

differential calculations are likely to be simple to make, and thus any need to determine damages on an individual basis does not suggest that a class action is not a superior method of resolving the parties' dispute.

Lisle also argues that both proposed classes fail to satisfy the superiority requirement because the issues of repairs to existing water systems and rate-related refunds fall within the exclusive jurisdiction of the ICC. However, in addition to the fact that the ICC does not possess jurisdiction over Lisle–the only defendant–because it is not a public utility, the ICC lacks statutory authority to adjudicate class action claims. *See* 83 Ill. Admin. Code § 200.95 (2008).

In sum, there are hundreds of potential class members, and separate adjudication of each of their claims would impose undue and unnecessary burdens on all parties as well as the Court. Plaintiffs' claims for injunctive relief turn largely on the alleged inadequacy of the current water system and the circumstances of Lisle's previous water main extensions. Their claims for the compensatory damages they seek are also well-suited for class-wide determination because they will require a comparison of IAWC's and Lisle's historical water rates and charges. The Court agrees and concludes that class adjudication would be a superior method for adjudicating the claims of both the Oak View-based Residential Class and the Schoolchildren Class, preserving judicial resources and litigation costs without unfair prejudice to Lisle or anyone choosing to opt out of a class.

## 3.    Standing

Lisle and IAWC dispute that the proposed Schoolchildren Class has standing to bring a claim against Lisle. As the Seventh Circuit has stated, the first requirement of standing under Article III of the Constitution is that a plaintiff "'must have suffered an injury in fact – an

invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical.'" *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 751 (7th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife, Inc.*, 504 U.S. 555, 560 (1992)). Second, Article III standing requires that the injury be "fairly . . . trace[able] to the challenged action." *Id.* Third, the Court must find that it is likely that a favorable decision will redress the injury. *Id.*

Lisle argues that the Schoolchildren Class cannot satisfy the first requirement because its members have no legally protected interest at stake. As the owner of the school property, the School District – not the schoolchildren – is the actual recipient of the water and the customer of the water system. Only the School District, Lisle contends, has "the right to demand and receive proper water service for each of its properties." Lisle Mot. for Reconsid. at 9. Lisle argues that any injury the schoolchildren might suffer would result from the School District's failure to make its buildings more safe, not from Lisle's unconstitutional treatment of the schoolchildren.[11]

In their complaint, plaintiffs contend that Lisle, having undertaken "a duty to supply water to *schools* at pressures and in volumes adequate to protect public health and to fight fires, has a duty to supply such water on a nondiscriminatory basis." 3d Am. Compl. ¶ 45 (emphasis added). They further contend that Lisle's "refusal to supply water *to schools* in the Class Area" at

---

[11] Lisle states—and plaintiffs do not dispute—that in October 2006, the School District entered into an agreement with Lisle to connect the schools to Lisle's municipal water system. Under the agreement, the School District has five years to pay, in equal monthly installments, the costs of extending Lisle's water mains. To permit the schools to connect to the municipal water system, however, the schools must first make some improvements to their infrastructures. According to George Attaway, the School District's assistant superintendent for business, the School District has not yet exercised its option to connect because of "the financial implications" of doing so. Ex. 41, Attaway Dep. at 76:12-14.

adequate fire-fighting pressures and volume deprived plaintiffs and the Schoolchildren Class of their equal protection rights. *Id.* ¶¶ 48-49 (emphasis added). In short, plaintiffs' allegations regarding the Schoolchildren Class concern Lisle's provision of water to schools, not to schoolchildren. Yet plaintiffs contend that Lisle's failure to connect the school properties to the municipal water system has deprived the schoolchildren, not the schools, of their equal protection rights. There is no question that if a fire occurs in one of the schools, schoolchildren will be at risk of bodily harm. In that event, however, the harm would flow from the schoolchildren's relationship with the schools, not from their relationship with Lisle as a provider of municipal water. The schoolchildren do not enter into water contracts, or pay water bills, or prepare the school properties for modifications to their water supplies; the School Board does all of that. In sum, plaintiffs do not have a legally protected interest in Lisle's equal provision of municipal water to their schools and to other schools. As such, they cannot establish that they have suffered an injury in fact. The Court accordingly finds that the Schoolchildren Class does not satisfy the requirements of Article III standing.[12]

Lisle also contends that prudential standing considerations, and particularly the general prohibitions against raising the rights of another and asserting generalized grievances, *see Warth v. Seldin*, 422 U.S. 490, 499 (1975), likewise bar the Schoolchildren Class's claims. Even if the Schoolchildren Class had established that it had Article III standing, it would still be barred from

---

[12] Plaintiffs' primary response to Lisle's standing arguments is their contention that parents have standing to bring claims on behalf of their children. *See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738, 2751 (2006) (finding that parents can bring an equal protection claim on behalf of their elementary- and middle-school children). Neither Lisle nor the Court disputes this proposition, *see* Fed. R. Civ. P. 17(c), but it does not control the standing issue raised by Lisle.

suit by prudential standing considerations. These considerations are intended to "'. . . limit access to the federal courts to those litigants best suited to assert a particular claim.'" *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 294 (7th Cir. 2000) (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100 (1979)). "Often the harm from a harmful act will ramify far beyond [the immediate] victim." *MainStreet Org. of Realtors*, 505 F.3d at 745. As Lisle points out, the potential indirect victims of Lisle's alleged refusal to connect the schools to the municipal water supply include not just schoolchildren, but all those who visit the schools, including faculty, administrators, and staff of the school, parents, delivery personnel, and others attending meetings or giving presentations.

With certain exceptions, however, "one cannot sue in a federal court to enforce someone else's legal rights." *Id.* at 746 (citations omitted). To fall within an exception, a party seeking third party standing must show that it has "a 'close' relationship with the person who possess the right" and that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citing *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). Lisle states that the interests of the School Board and the children are "insufficiently aligned" because the School Board has used its discretionary power not to exercise its existing water contract with Lisle. IAWC/Lisle Resp. to Mot. for Class Cert. at 35. Nothing impedes the School District from filing a suit similar to plaintiffs' alleging that Lisle has violated its rights by refusing to supply municipal water to these schools. Because the party with the greatest interest in bringing a claim for the violation of the School District's equal protection rights is the School District itself, this claim belongs to it alone.

In sum, the Court finds that the proposed Schoolchildren Class lacks standing to pursue its

claims against Lisle.

**Conclusion**

For the foregoing reasons, the Court vacates its memorandum opinion and order of February 4, 2008. The Court denies plaintiffs' motion for class certification [docket no. 72] as to the proposed Schoolchildren Class and grants plaintiff's motion in part as to the Residential Class, certifying a class consisting of all individuals who own or reside in residential property in the Oak View subdivision of Lisle, but declining to certify a class of Meadows residents. Any class claims brought on behalf of Meadows residents and the Schoolchildren Class are dismissed without prejudice due to the lack of an adequate class representative and lack of standing, respectively.

The parties are directed to appear for a status hearing on June 10, 2008 at 9:30 a.m. for the purpose of addressing the subjects of class notice and a schedule for the completion of discovery. The parties are directed to meet and confer prior to that date and to submit proposals for class notice to the Court by no later than June 6, 2008.

_____
MATTHEW F. KENNELLY

Date: May 30, 2008                                                    United States District Judge